## CITIZENS FOR A BETTER ENVIRONMENT, Petitioner,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

### No. 80–1531.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1981.

Decided May 26, 1981.

Rehearing and Rehearing In Banc Denied Sept. 9, 1981.

---

Robert E. Yuhnke, Chicago, Ill., for petitioner.

Jose R. Allen, Land & Natural Resources Div., Washington, D. C., Eric Smith, Environmental Prot. Agcy., Washington, D. C., James T. Harrington, Chicago, Ill., for respondent.

Before SWYGERT, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

This case involves challenges to two rules under the Clean Air Act, 42 U.S.C. § 7401 et seq., submitted by the state of Illinois to the United States Environmental Protection Agency ("USEPA") and approved by USE-

PA. We find that the first set of rules, "New Source Rules," was not properly submitted to USEPA; therefore USEPA's approval is invalid. We thus have no jurisdiction to consider the challenges to those rules. We find the second rule challenged, "Rule 203(f)," not to be arbitrary and capricious; we therefore affirm USEPA's approval.

## I

The rules challenged in this case are contained in the Illinois State Implementation Plan ("SIP") approved by USEPA.[1] In April, 1979, the State of Illinois submitted revisions of its SIP to USEPA. In July, 1979, USEPA published a Notice of Proposed Rulemaking in which it recommended approval of part of the revisions, approval with conditions of other parts, and disapproval of remaining parts. Subsequently, comments on the proposed rules were filed by Citizens for a Better Environment ("CBE") and other interested parties. Illinois then submitted numerous additions, revisions, and supplements to its original revision. These additions contained the rules challenged here: (1) the final Rules for Issuance of Permits to New or Modified Air Pollution Sources Affecting Nonattainment Areas ("New Source Rules") and (2) the final order of the Illinois Pollution Control Board adopting Rule 203(f). On February 21, 1980, USEPA published a final rule regarding the Illinois SIP, as amended. Again, USEPA approved in part, approved with conditions in part, and disapproved in part. In this action, USEPA approved the New Source Rules and Rule 203(f).

CBE now challenges the approval of these two rules. CBE argues that the New Source Rules are unconstitutional or, in the alternative, that they are substantially defective. CBE objects to the approval of Rule 203(f) on two substantive grounds.

## II

We begin with the New Source Rules. Petitioners Interlake, Inc., Marquette Company, Inc., United States Steel Corporation, and Intervenor-Petitioner Republic Steel Corporation ("steel companies") argue that this Court does not have jurisdiction to consider CBE's constitutional challenge at this time. The steel companies argue that for a court to take jurisdiction, challenged USEPA action must be "final", but that USEPA actually took no valid action, let alone "final" action, on the Illinois New Source Rules, as amended.

■ The steel companies correctly argue that final action is required. Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), provides for review in a court of appeals of "the Administrator's action in approving or promulgating any implementation plan ... or any other final action ...." As we stated in *Bethlehem Steel v. United States Environmental Protection Agency*, 536 F.2d 156, 161 (7th Cir. 1976), *quoting Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), if challenged agency action under the Clean Air Act is not final, "we must postpone our review in order 'to protect the agencies from judicial interference until an administrative decision has been formalized.'"

To determine whether USEPA's approval of the Illinois New Source Rules amounted to "final" action, we must examine precisely what it was that USEPA approved. The steel companies argue that the New Source Rules which USEPA approved were never valid under Illinois law. They further argue that other New Source Rules which were valid under state law, because of amendment of the Illinois statute, were never approved by USEPA.

Pursuant to Part D of the Clean Air Act Amendments of 1977, 42 U.S.C. §§ 7501–08, the Illinois Environmental Protection Agency ("Agency") in 1979 began developing revisions to its procedures for the issuance of permits to new sources of air pollution lo-

---

1. Under 42 U.S.C. § 7410, the states are required to adopt and submit to USEPA state implementation plans. These SIP's must pro- vide for implementation, maintenance, and enforcement of the Act's standards.

cated in designated nonattainment areas, as defined in 42 U.S.C. § 7501(2). During the course of the development of these rules, both CBE and the steel companies vigorously opposed their adoption by the Agency on the ground that the Agency had no authority under the Illinois Environmental Protection Act, Ill.Rev.Stat. ch. 111½, § 1001 et seq. ("Illinois Act"), to adopt the rules. The adoption of such rules, petitioners argued, was within the purview only of the Illinois Pollution Control Board, the agency that was given primary responsibility to promulgate regulations governing air pollution by the Illinois Act. USEPA, during development of the rules, also questioned the authority of the Agency to prepare and enforce the New Source Rules.

■ At the time that the petitioners were challenging the validity of the Illinois Agency's New Source Rules, Illinois law granted sole authority to the Illinois Pollution Control Board to promulgate substantive environmental control standards; the Illinois Act also required that the Board follow specified rulemaking procedures in promulgating such standards. Ill.Rev.Stat. ch. 111½, § 1005.[2] The Illinois Act did not give the Agency authority to adopt the New Source Rules. Therefore, the petitioners are correct. The New Source Rules which were submitted by the Agency to USEPA, and upon which USEPA purportedly issued conditional "final" approval, were void under state law. See Landfill, Inc. v. Pollution Control Board, 74 Ill.2d 541, 25 Ill.Dec. 602, 606, 387 N.E.2d 258, 262

(1978) (if an agency promulgates rules without the statutory authority to do so, the rules are void).

Responding to concern that the Illinois Agency illegally promulgated the New Source Rules, USEPA approved those Rules on the condition that Illinois either: (1) submit, within 180 days, a determination signed by the Illinois Attorney General that the Agency's promulgation of the New Source Rules was consistent with Illinois law; or (2) submit another New Source review plan, consistent with Illinois law, which met the requirements of the Clean Air Act. Neither condition has been met. First, no Attorney General opinion has been supplied, presumably because the initial promulgation was clearly inconsistent with state law. Second, although legislative changes have been made regarding the legitimacy of the New Source Rules, those changes did not accomplish the resubmittal of valid rules to USEPA.

On September 4, 1980, the Illinois Environmental Protection Act was amended by Senate Bill 1979, Public Act 81–1444. As a result of this amendment, the Pollution Control Board retained its authority to establish rules for New Source permit programs meeting the requirements of Section 173 of the Clean Air Act. Ill.P.A. 81–1444 § 2(d).[3] The amendment then provided that the Agency's New Source Rules would be in effect until the Board adopted its rules, but the amendment did not retroactively authorize the Agency's rules in toto. Ill.P.A. 81–1444 § 2(e).[4] First, the amend-

---

**2.** The Illinois Act provides, in pertinent part:
(b) The Board shall determine, define and implement the environmental control standards applicable in the State of Illinois and may adopt rules and regulations in accordance with Title VII of this Act.
(c) The Board shall have authority to act for the State in regard to the adoption of standards for submission to the United States under any federal law respecting environmental protection....

**3.** Illinois Public Act 81–1444 § 2(d) provides:
The Board shall adopt regulations establishing permit programs meeting the requirements of Sections 165 and 173 of the Clean Air Act (42 USC 7475 and 42 USC 7503) as amended. The Agency shall adopt proce-

dures for the administration of such programs. On or before October 1, 1981, the Board shall adopt the regulations establishing a permit program meeting the requirements of Section 173 (42 USC 7503).

**4.** Illinois Public Act 81–1444 § 2(e) provides:
From the date of their adoption until October 1, 1982, or the effective date of the board regulations implementing Section 173 of the Clean Air Act (42 USC 7503), whichever is earlier, ... the [New Source Rules] promulgated by the Agency and as amended from time to time, shall be in effect, provided that the Agency may not impose any condition or requirement more stringent than required by the Clean Air Act, as amended, this Act, or

ment placed substantive limitations on the New Source Rules by providing that those Rules can be no more stringent than those imposed by the Clean Air Act. Second, the Amendment placed procedural limitations on the New Source Rules by requiring the Agency to give written notice of its proposed decision to the permit applicant and by requiring the Agency to provide for a hearing only for applicants—not citizens. Ill.P.A. 81–1444 §§ 9(d)(2), (3).[5]

This case presents a serious challenge to major environmental regulation. The stakes involved are extremely high. Given the importance of these stakes, we are reluctant to dismiss requirements for proper legislative and administrative action as mere "technicalities". Even if the amendment had specifically enacted the New Source Rules in toto, the New Source Rules as amended were never submitted to USEPA. Thus, we can not take jurisdiction to a challenge of the "approval" of rules which have never, in fact, been properly approved. Moreover, the amendment, by imposing substantive and procedural constraints on the New Source Rules, did more than merely "legalize" rules already approved by USEPA.

■ CBE seems to argue that, if the amended New Source Rules were resubmitted to USEPA, there is no question that USEPA would approve them. But we are not persuaded that it is beyond reasonable dispute that USEPA would approve the new, amended, Rules.[6] USEPA may determine that the Clean Air Act is meant to act as a minimum, not a maximum, requirement and that, therefore, the amendment's prohibition of any stricter guideline is improper. USEPA also may determine that the SIP should offer a hearing to citizen protestors as well as to permit applicants, and that, therefore, the amendment's provision of a hearing only for applicants is improper.[7]

We have neither a crystal ball nor psychic abilities. We are unwilling, and unable, to predict what action USEPA will take when confronted with valid New Source Rules. Therefore, we conclude that we have no jurisdiction of the constitutional and substantive challenges to the New Source Rules because no valid New Source Rules have been approved by USEPA. There is no final action for us to review.[8]

### III

We now turn to Illinois Pollution Control Board Rule 203(f). The validity of this rule under state law is not disputed. Rule 203(f) requires that certain mining operations, manufacturing operations, and electric generating operations control fugitive particulate emissions from storage piles, plant

---

the regulations of the Board. The burden of establishing that any condition or requirement imposed by the Agency in or for the issuance of a permit is more stringent than required by the Clean Air Act, as amended, shall be upon the permit applicant.

5. Illinois Public Act 81–1444 §§ 9(d)(2), (3) provide:
  (2) The Agency shall, after conferring with the applicant, give written notice to the applicant of its proposed decision on the application including the terms and conditions of the permit to be issued and the facts, conduct or other basis upon which the Agency will rely to support its proposed action;
  (3) Following such notice, the Agency shall give the applicant an opportunity for a hearing in accordance with the provisions of "The Illinois Administrative Procedure Act", . . . .

6. A judicially noticed fact must be one not subject to reasonable dispute. *See* Fed.R.Evid.

201; *see generally United States v. Greschner*, 647 F.2d 740 at 747 n.2 (7th Cir. 1981).

7. We realize, of course, that in this case, USEPA argues that a hearing and allowance of judicial review for citizen protestors as well as for permit applicants is not constitutionally required. Nevertheless, we are not able to determine whether USEPA, when reviewing the Rules on a clean slate, might either change its position or determine that denial of a hearing for all parties is improper on other grounds.

8. The steel companies argue only that we have no jurisdiction of the constitutional challenge to the New Source Rules. But we also have no jurisdiction of the substantive challenge to the New Source Rules (that the rules fail to implement one of the Clean Air Act requirements) for the same reason. No valid New Source Rules have been approved by USEPA.

roads, and various other specified sources of such emissions. Rule 203(f) further requires sources to operate under the provisions of an operating program prepared by the source. Operating programs must be submitted to the state for review, but the rule does not provide for approval or disapproval by the state. With conditions and an exception not relevant to this challenge, USEPA approved Rule 203(f). 45 Fed.Reg. at 11478.

CBE argues that the USEPA's approval of Rule 203(f) was arbitrary and capricious for two reasons. First, CBE argues that the rule is not enforceable, either by USEPA or by private citizens. Second, CBE argues that the rule does not comply with the Clean Air Act, which requires that all reasonably available control technologies be implemented "as expeditiously as practicable." We find that USEPA's approval of the rule was not arbitrary and capricious.[9]

### A

We consider first the enforcement argument. CBE argues that Rule 203(f) is not enforceable for two reasons. First, the rule does not establish any precise benchmarks as to how much emission reduction is required by any source governed by the rule. Second, the operating plan that sources must submit is not a part of the SIP and, therefore, is not enforceable.

First, USEPA was initially concerned about the problem of specific benchmarks for enforcement and questioned whether Rule 203(f) was enforceable. Af-

ter considering the response from the state and from the public, it concluded that Rule 203(f) did contain an adequate enforcement mechanism. 435 Fed.Reg. at 11478. We find that USEPA's conclusion was not arbitrary or capricious.

It is true that, at first glance, Rule 203(f) seems to be toothless. The rule requires that certain control strategies be used "as needed," but it does not specify how "as needed" is to be determined. The rule states neither how much emission reduction is required nor what emission level is allowed. Although the rule requires that sources submit operating programs, it provides no criteria for what must be in those operating programs. Moreover, sources need only file their operating programs with the state; no approval is required. Also, apparently sources are free to change the program at any time without leave from the state.

But USEPA argues that precise benchmarks, such as conventional emission limitations or numerical percentage reductions, are not workable when dealing with the nonconventional sources of particulates, such as storage piles, mining operations, or plant access roads, of the type covered by Rule 203(f). USEPA, agreeing with the Illinois Pollution Control Board,[10] concluded that, with regard to fugitive particulate emissions, it is more practical, because of problems in determining compliance, to require the use of operating programs which specify equipment to be used, rather than to set specific emission limitations. USEPA has concluded that a "percentage limi-

---

9. Our review of USEPA's approval of SIP's submitted under the Act is made in accordance with the "arbitrary and capricious" standard set forth in 5 U.S.C. § 706(2)(A). *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994 at 1003–4 (7th Cir. 1980). *See Northern Lung Ass'n v. EPA*, 572 F.2d 1143, 1148–49 (6th Cir. 1978); and *Delaware Citizens For Clean Air, Inc. v. EPA*, 480 F.2d 972, 976 (3d Cir. 1973).

10. USEPA relies on the Illinois Pollution Control Board's opinion on Rule 203(f):

It is more practical to require the use of equipment to control traditional fugitive particulate emissions than to set specific emission limitations because of difficulties in de-

termining compliance with specific limitations. For example, emissions from storage piles can vary with wind speed, disturbance of the storage pile, pile height and configuration, size and density of the particulate matter in the pile, moisture content of the pile, and type of control technology used, if any. Since many of these factors are beyond the control of the owner or operator, it would be difficult to set an equitable emission limitation. Requiring control technology would aid both the owner or operator and the Agency in determining compliance. As long as a source is controlled by specified or equivalent technology it will be in compliance.

tations" approach would not be effective with regard to emissions from storage piles, for example, because those emissions typically vary according to wind speed; pile height and configuration; and size, density, and moisture content of particulate matter in the pile. USEPA concluded that since many of these factors are beyond the control of a pile owner or operator, it would be difficult to set an equitable limitation. On the other hand, USEPA concluded, to require the owner to specify a control technology in an operating program would aid both the owner and the agencies in determining compliance. These conclusions may be debatable, but we cannot conclude that they are arbitrary or capricious.

Although the degree of specificity in a "percentage limitation" approach is higher than in the "operating program" method used by Rule 203(f), it does not follow that Rule 203(f) is unenforceable. The owner of a source does not have unfettered discretion to come up with just any operating program; rather, the operating program must "significantly" reduce fugitive emissions. Rule 203(f)(3)(F). To be sure, it is unclear what is required to prove a violation under the "significant reduction" standard. But many legal standards, "reasonableness", perhaps, being the prime example, are not clearly defined. These standards must be determined, as a question of fact, in terms of their application to particular situations.

This issue of application of the standards brings us to the critical problem of CBE's argument. The CBE challenge is simply premature. CBE argues that because "significant reduction" is undefined, no legal challenge can be won under that standard against a polluter. USEPA argues that the standard must necessarily be imprecise, because of the variety of situations in which it must be applied, but that the standard is susceptible of proof. Until and unless we are confronted with a specific case where a challenger, such as CBE, attempts to prove a violation of the "significant reduction" standard, but is unable to prove such a violation because a court or agency holds that there are no standards by which to establish failure to achieve a "significant reduction," we must agree with USEPA. The standards of "significant reduction" should, and would seem to, allow proof that an operating program does not "significantly" reduce fugitive emissions where a greater reduction could be achieved by use of another operating program. This proof could take the form of expert testimony or of comparative evidence demonstrating the degree of emission reduction achieved by other similar sources.[11]

CBE's second argument that Rule 203(f) is not enforceable is that the operating plans are not enforceable because they are not part of the Illinois SIP. CBE argues that because any given operating program is neither "adopted" by Illinois nor "approved" by USEPA, such a program can not be enforceable by USEPA under 42 U.S.C. § 7413, or by private citizens under 42 U.S.C. § 7604, because only the provisions which form part of a SIP are subject to the enforcement provisions of the Act.

▆▆▆▆ But Rule 203(f) specifically requires owners or operators of potential sources of fugitive particulate matter to adopt an operating program and submit it to the state, Rule 203(f)(3)(F). Specific types of sources must follow specified abatement technologies, Rule 203(f)(3)(A)–(E). Operating programs must be designed to "significantly reduce" fugitive particulate emissions, Rule 203(f)(3)(F). The requirement of Rule 203(f) that a source "*shall* be operated" (emphasis added) under the provisions of the operating program can only mean that sources must comply with the provisions of their operating programs.

---

11. CBE argues that the decision in *Donner Hanna Coke Corp. v. Castle*, 464 F.Supp. 1295 (W.D.N.Y.1979) requires that specific procedures for determining compliance be spelled out in all rules promulgated pursuant to the Clean Air Act. But the *Donner Hanna* decision provides no assistance for the resolution of the issues in this case. The *Donner Hanna* court held that USEPA must use proper rulemaking procedures when it attempts to change a performance standard for smoke opacity which it had earlier approved in a SIP. 464 F.Supp. at 1304–05. That holding does not suggest that the use of an "operating program" method of enforcement is improper.

It is not necessary that the operating programs specifically be made part of the SIP. Because Rule 203(f) is approved by USEPA, the operating programs required by Rule 203(f) are subject to challenge and review. Thus, we conclude that if at any time a source does not comply with the operating program required by Rule 203(f), the source is subject to an enforcement action by USEPA, the state, and any citizen.[12]

Finally, CBE argues that an operating program of the type prescribed by Rule 203(f) is not governed by the Act because it is not an "emission limitation" or "emission standard." But section 302(k) of the Act, 42 U.S.C. § 7602(k), defines an "emission limitation" or "emission standard" as "including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." The "operating program" required by Rule 203(f) seems clearly within the meaning of "any requirement relating to the operation" in section 302(k). For all of the foregoing reasons, we reject CBE's argument that Rule 203(f) is necessarily unenforceable on its face.

### B

CBE's second argument against Rule 203(f) is that the rule does not require implementation of all operating programs "as expeditiously as practicable." The Act requires that "all reasonably available control measures" be implemented "as expeditiously as practicable." 42 U.S.C. § 7502(b)(2). Because section 172(a)(1) of the Act, 42 U.S.C. § 7502(a)(1), sets December 31, 1982, as the deadline for achieving the primary national standards for particulates, implementation of control measures must occur no later than this date. Rule 203(f) does not require compliance until "on or after December 31, 1982."

■ CBE argues that the use of the "last date" deadline is inconsistent with attainment "as expeditiously as practicable" because "[m]any sources governed by the rule will have to do no more than buy a hose or operate a spray truck." CBE Br. at 73. CBE does not, however, identify any sources whose compliance programs will consist only of these methods. Indeed, CBE proffers no specific evidence that, under Rule 203(f), any class of pollution source will not be implementing any "reasonably available control measures" as "expeditiously as practicable." Thus, CBE's challenge amounts to mere paper pleadings.[13]

Not only is CBE's assertion that earlier implementation of control measures is easi-

---

12. *See* the Illinois Pollution Control Board's opinion on Rule 203(f), which provides in part:

Rule 203(f)(3)(F) requires certain sources to be operated under the provisions of an operating program. The operating program must be "designed to significantly reduce fugitive particulate emissions." This requirement allows facilities needed flexibility to use the control system most appropriate for their sources. Although the Agency does not have approval power, it will review the operating programs to determine if they "significantly reduce fugitive particulate emissions." If the Agency feels a program is inadequately designed and the source disagrees, an action before the Board will be necessary to resolve the dispute. An enforcement action can also be brought against a source not following the provisions of its own operating program.

13. CBE argues that *Union Electric v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), requires USEPA to use a "limitations" approach and to ensure that compliance schedules provide for compliance with specified limitations as soon as technologically feasible. But

CBE seriously misreads *Union Electric*. First, the Court did not hold that a "limitations" approach rather than an "operating program" approach must be used. That question was not an issue in the case. Second, the Court in *Union Electric* held that language in the Act regarding attainment of secondary standards within a "reasonable time" could not be used to *delay* compliance beyond the three year deadline for attainment of primary air standards. 427 U.S. at 256–59, 96 S.Ct. at 2525–26. The Court held that the three year deadline for primary standards was of a "technology-forcing character," 427 U.S. at 257, 96 S.Ct. at 2525, *quoting Train v. Natural Resources Defense Counsel*, 421 U.S. 60, 91, 95 S.Ct. 1470, 1487, 43 L.Ed.2d 731 (1975), and that USEPA could not disapprove a state plan on a ground of economic or technologic infeasibility where that state plan required compliance in three years or less. 427 U.S. at 265, 96 S.Ct. at 2529. But nothing in *Union Electric* suggests that USEPA should have mandated compliance with certain aspects of Rule 203(f) in less than the statutory time period, especially in response to

ly feasible speculative, but also the use of the "last date" deadline does not mean that no compliance will take place before then. Obviously, sources must develop and implement compliance methods so that those methods will be operational by December 31, 1982. Moreover, USEPA argues that, contrary to CBE's assertion, the control technologies required by Rule 203(f) for certain industrial sources will involve far more than a garden hose or a spray truck. For example, USEPA asserts that in bulk loading operations such as those involving rail cars and truck loading, the control technology may consist of enclosing the entire operation, collecting emissions by the use of hoods, and venting the emissions to a control device. USEPA App. at 1–3. Implementing such a control program requires time for planning and construction prior to final compliance. Thus, for all of the foregoing reasons, we find that it was not arbitrary or capricious for USEPA to approve the compliance deadline of December 31, 1982.[14]

### IV

We have carefully considered all of the other arguments of the parties not specifically discussed in this opinion. We find those arguments either wanting merit or insufficiently important to warrant extended discussion; their discussion would not have altered this result. For the reasons discussed in this opinion, we find that the Illinois New Source Rules are invalid and USEPA's approval of those rules is vacated. USEPA's approval of Rule 203(f) is affirmed.

Therefore, the rules approved by USEPA are

**Vacated in Part and Affirmed in Part.**

---

only a paper challenge, with no documentation that any earlier compliance is technologically or economically feasible.

**14.** In finding that USEPA's approval of the deadline for compliance with Rule 203(f) was not arbitrary or capricious, we also reject the steel companies' argument that the "expeditiously as practicable" requirement applies only to the overall SIP and not to each element of the plan. The interpretation suggested by the steel companies would totally ignore Section 172(b)(2) of the Act, 42 U.S.C.

§ 7502(b)(2), which states that the plan *provisions* must provide for implementation of all reasonably available control measures as expeditiously as possible. This language plainly requires that *all* relevant plan provisions be implemented as expeditiously as practicable except, of course, where the state has established another deadline on or prior to December 31, 1982, in order to attain compliance with the primary national ambient air quality standards. *See Train v. NRDC, supra* note 13.