805 F.2d 176
 25 ERC 1197, 90 A.L.R.Fed. 459, 17
Envtl. L. Rep. 20,235
 STATE OF MICHIGAN, a sovereign state of the United States of
America, et al., Petitioners,
v.
Lee M. THOMAS, Administrator of the United States
Environmental Protection Agency, and the United
States Environmental Protection Agency,
Respondents.
 No. 85-3674.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 12, 1986.
Decided Nov. 12, 1986.
 
 Stephen F. Schuesler (argued), Asst. Atty. Gen., Environmental Protection Div., Frank Kelley, Louis Caruso, Lansing, Mich., Joseph M. Polito (argued), Elizabeth A. Lowery, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for petitioners.
 Andrea Bear Field, Hunton & Williams, Washington, D.C., for amicus curiae Alabama Power Co.
 Lisa F. Ryan (argued), Environmental Defense Section, Land & Resources Div., U.S. Dept. of Justice, Washington, D.C., for respondents.
 Before MARTIN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 The State of Michigan and numerous companies and trade associations have petitioned for review of the U.S. Environmental Protection Agency's final action under the Clean Air Act, as amended 42 U.S.C. Secs. 7401 et seq., concerning rules proposed by Michigan to control fugitive dust emissions. The Agency's partial disapproval of the rules triggered a construction moratorium in those areas of Michigan that have not achieved the ambient air quality standard for total suspended particulates.
 
 
 2
 Under the Clean Air Act Amendments of 1970, the Agency must promulgate National Ambient Air Quality Standards for a number of pollutants. 42 U.S.C. Sec. 7409. The legislative scheme to achieve these standards was succinctly described by this Court in Dressman v. Costle, 759 F.2d 548, 551 (6th Cir.1985) (footnotes omitted):
 
 
 3
 Each state has the "primary responsibility" for ensuring that its air meets NAAQS [National Ambient Air Quality Standards]. CAA Sec. 107(a), 42 U.S.C. Sec. 7407(a). In order to fulfill its responsibility, each state must submit to the EPA Administrator a state implementation plan ("SIP") that provides for the attainment of NAAQS within its borders. CAA Sec. 110(a)(1), 42 U.S.C. Sec. 7410(a)(1). The Administrator must approve a SIP if it meets the criteria set forth in CAA Sec. 110(a)(2)(A)-(H), 42 U.S.C. Sec. 7410(a)(2)(A)-(H).
 
 
 4
 The states were to achieve NAAQS by 1975, but many states ... failed to meet NAAQS by the statutory deadline. As a result of this widespread nonattainment, Congress amended the CAA in 1977 by adding Part D to Title I of the Act. CAA Secs. 171-178, 42 U.S.C. Secs. 7501-08. Part D applies only to areas in which NAAQS have not been attained ("nonattainment areas"). Under Part D, the states with nonattainment areas were to adopt SIPS that would accomplish attainment of primary NAAQS not later than December 31, 1982. These revisions were to be submitted to the Administrator by January 1, 1979, and were to be approved or disapproved by July 1, 1979. Any state that did not have an approved SIP that provided for primary NAAQS attainment not later than 1982 was subject to a moratorium on the construction of new "major stationary sources" of pollution and on the "major modification" of existing major sources in nonattainment areas. CAA Sec. 110(a)(2)(I), 42 U.S.C. Sec. 7410(a)(2)(I).
 
 
 5
 Section 172(b) of the Clean Air Act lists the provisions that a state implementation plan must include in order to avoid a construction moratorium. This section provides that a plan shall require "reasonable further progress ... including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology." 42 U.S.C. Sec. 7502(b)(3). The state plan must also include "written evidence that the State ... [has] adopted by statute, regulation, ordinance, or other legally enforceable document, the necessary requirements and schedules and timetables for compliance, and [is] committed to implement and enforce the appropriate elements of the plan." Id. at Sec. 7502(b)(10). "Reasonably available control technology" has been defined at 40 C.F.R. Sec. 51.1(o) to mean "devices, systems, process modifications, or other apparatus or techniques, the application of which will permit attainment of the emission limitations set forth in Appendix B to this part." Appendix B of 40 C.F.R. Part 51 is entitled "Examples of Emission Limitations Attainable With Reasonably Available Technology." Since 1976, the EPA has interpreted "reasonably available control technology" to be "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." This definition was first articulated in a memorandum by Roger Strelow, Assistant Administrator for Air and Waste Management.
 
 
 6
 In order to satisfy fully these Part D nonattainment requirements, Michigan submitted to the Environmental Protection Agency rules designed to control fugitive dust at the traditional sources of such emissions. On November 15, 1982, the Agency approved these rules. 47 Fed.Reg. 51,398 (1982). The Natural Resources Defense Council challenged this action, and this Court granted EPA a voluntary remand to reconsider its approval of the rules. NRDC v. Gorsuch, 723 F.2d 910 (6th Cir.1983). The Agency then proposed to disapprove the rules. 48 Fed.Reg. 54,377 (1983).
 
 
 7
 Michigan began to formulate new rules to satisfy the Part D requirements. The EPA informed Michigan that:
 
 
 8
 Most of the industrial fugitive dust regulations around the country that have been approved by the Agency have followed the example of RACT-based fugitive dust rule provided by USEPA in Appendix B of 40 CFR Part 51. It now appears that this example is no longer useful as a model RACT rule, because increased knowledge of the subject has pointed out the need for more specificity than this guidance contains. In addition, in April 1978, the Agency's Manual for the Workshop on Requirements for Nonattainment Area Plans (OAQPS No. 1.2-103) stated that Appendix B of Part 51 does not represent RACT (p. 149).
 
 
 9
 Region V believes that Michigan would be well advised not to model its new industrial fugitive dust rule on the Appendix B example, or on the similar State rules around the country. Instead, Region V would encourage Michigan to use as its guide the definition of RACT itself. RACT is the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available, considering technological and economic feasibility.
 
 
 10
 Letter from EPA Region V Administrator to Chief of Air Quality Division, Michigan Department of Natural Resources (July 9, 1984). On September 28, 1984, Michigan informally submitted proposed rules to the EPA. In early December, however, Michigan withdrew its support for that proposal and released draft rules similar to Illinois' fugitive dust rules. In comments released December 17, 1984, the EPA stated that with some modification, the September 28 rules would be acceptable. Concerning the December 1984 proposal, however, the EPA declared:
 
 
 11
 USEPA believes that the adoption by Michigan of a rules package nearly identical to the Illinois fugitive dust rules is inappropriate. The Agency approved the Illinois regulations for Part D purposes on February 21, 1980 (45 FR 11472), nearly five years ago. The Agency now believes that regulations such as those in Illinois may not now be approvable due to (1) new information as to what constitutes reasonably available control technology (RACT), and (2) increased Agency concern that rules be specific enough to allow anyone reading them to readily understand and come to the same conclusion as to what is required by them.
 
 
 12
 If Michigan were to adopt industrial fugitive dust regulations based on the Illinois model, it is quite likely that USEPA would disapprove them. Such disapproval combined with the final withdrawal of approval of Rules 371 and 372 would leave Michigan without a fully approved Part D Plan for particulate matter and could result in the immediate reimposition of the growth moratorium in primary nonattainment areas for particulate matter (i.e., the construction ban, pursuant to Section 110(a)(2)(I) of the Clean Air Act, on major new or modified sources of particulate matter).
 
 
 13
 In discussions over the next several months, the EPA reiterated its concern that these rules modeled from the Illinois rules would be deficient.
 
 
 14
 On April 25, 1985, Michigan formally submitted to the EPA the fugitive dust rules which we are now reviewing. Rule 336.1371 and Rule 336.1372 address the procedures for the development of industrial fugitive dust control programs in total suspended particulate attainment areas and the content of such programs. Rule 336.1373 addresses industrial sources of fugitive dust in nonattainment areas and outlines some control strategies in general terms. The rule states that control programs submitted by sources to the state must "be designed to significantly reduce fugitive dust and shall reduce the fugitive dust emissions to a level that a particular source is capable of achieving by the application of control technology that is reasonably available, considering technological and economic feasibility."
 
 
 15
 On May 30, 1985, EPA published a notice of proposed rulemaking concerning the Michigan plan. 50 Fed.Reg. 23,028 (1985). Following the receipt of comments, EPA published its notice of final rulemaking on August 20, 1985. 50 Fed.Reg. 33,535 (1985). The final action incorporated all three rules into the Michigan State Implementation Plan for the purposes of section 110(a)(2) of the Clean Air Act, but disapproved the overall state plan as not being adequate to satisfy the Part D requirements of the Act. In its final action, the EPA noted among other concerns that effective implementation of the proposed rules depended too much on discretionary action of Michigan and that the rules would allow approval of measures less stringent than reasonably available control technology. The disapproval triggered the new source restrictions of section 110(a)(2)(I) of the Act to apply in the Michigan total suspended particulate nonattainment areas.
 
 
 16
 Our review of the EPA's final action regarding the Michigan state implementation plan is
 
 
 17
 an extremely narrow one. The standards set out in the Administrative Procedure Act (APA), 5 U.S.C. Sec. 706, are controlling. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); South Terminal Corp. v. Environmental Protection Agency, 504 F.2d 646, 655 (1st Cir.1974). Those APA guidelines require us to determine whether the EPA followed the proper lawful procedures and acted within its statutory authority when it promulgated its final rulemaking and whether that rulemaking is constitutional. If so, we may set aside the EPA actions only if we find that the actual choices made were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 18
 National Steel Corp., Great Lakes Steel v. Gorsuch, 700 F.2d 314, 320 (6th Cir.1983). In reviewing the section 706(2)(A) finding,
 
 
 19
 the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
 
 
 20
 Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citations omitted). In reviewing the aspects of this dispute pertaining directly to the EPA's evaluation of the technical data, we note that courts are well-advised to study the record carefully but to " 'look at the [agency's] decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.' " Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 905 (5th Cir.1983) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976)). See also Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (when examining certain scientific determinations, "a reviewing court must generally be at its most deferential"); FPC v. Florida Power & Light, 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972).
 
 
 21
 Michigan lists numerous errors made by the Agency in its final rulemaking, disapproving the Michigan rules. Michigan asserts that its proposed rules are consistent with 40 C.F.R. Sec. 51.1(o) and Appendix B and should therefore have been approved, pointing to the Illinois and Wisconsin rules that have been approved under these provisions as "reasonably available control technology." Michigan also claims that the EPA's use of the definition of reasonably available control technology of the Strelow Memorandum constitutes impermissible ad hoc rulemaking. Michigan further claims EPA should have used formal notice and comment rulemaking procedures before adopting this definition.
 
 
 22
 Our first step in the review of the action by EPA is to determine which definition of reasonably available control technology must be used to measure the Michigan rule. The definition of 40 C.F.R. Sec. 51.1(o) in conjunction with Appendix B does not specifically and conclusively establish the reasonably available control technology for control of fugitive dust emissions in nonattainment areas. Regarding fugitive dust emissions, Appendix B states: "Reasonable precautions can be taken to prevent particulate matter from becoming airborne. Some of these reasonable precautions include the following...." The reasonable precautions offered are of a general nature, as an example, the "[c]onduct of agricultural practices such as filling of land, application of fertilizers, etc., in such manner as to prevent dust from becoming airborne." Viewed as a whole, these provisions do not purport to establish reasonably available control technology but serve only as general guidelines.
 
 
 23
 While EPA was not required to measure the Michigan rule against 40 C.F.R. Sec. 51.1(o) in conjunction with Appendix B, in our review we must still determine whether the use of the Strelow Memorandum definition of reasonably available control technology in the EPA's final action constitutes ad hoc rulemaking. That requires us to examine the nature of the definition to determine whether formal notice and comment rulemaking procedures must be followed. Michigan argues that the definition has a substantive legal effect and thus should have been promulgated against 5 U.S.C. Sec. 553. EPA argues that to the extent its definition is a rule, it is an interpretative rule and, pursuant to the exception of 5 U.S.C. Sec. 553(b)(A), it did not have to follow notice and comment rulemaking procedures.
 
 
 24
 The line between legislative and interpretative rules is blurred at best, but some general principles exist to distinguish the two. The District of Columbia Circuit has stated:
 
 
 25
 An interpretative rule simply states what the administrative agency thinks the statute means, and only " 'reminds' affected parties of existing duties." ... On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule....
 
 
 26
 General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985) (citations omitted). In holding that the EPA definition is an interpretative rule that "simply states what the administrative agency thinks the statute means," we note that the definition clearly harmonizes with the language and purpose of section 172(b) of the Clean Air Act's Part D. 42 U.S.C. Sec. 7502(b)(3). The general purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. Sec. 7401(b)(1). Part D of the Clean Air Act requires those states with nonattainment areas to implement additional control measures in order to achieve the broad goals of the Act. Simply put, the EPA's definition of reasonably available control technology explains the term as used in section 172(b)(3) of the Act's Part D and certainly does not create any "new law, rights or duties." As such under the Administrative Procedures Act 5 U.S.C. Sec. 553(b)(A), it is an interpretative rule that does not require notice and comment procedures prior to its adoption. See General Motors Corp. v. Ruckelshaus, 742 F.2d at 1566; Montana Power Co. v. EPA, 608 F.2d 334, 350 (9th Cir.1979).
 
 
 27
 Having determined that the EPA's definition was properly promulgated, we must now turn to whether the definition is a permissible interpretation of section 172(b)(3) of the Clean Air Act and could therefore properly be used by the EPA in considering the Michigan rules. These principles are also well-established:
 
 
 28
 If the administrative construction runs counter to clear congressional intent, then the reviewing court must reject it.... On the other hand, if the administrative construction does not contravene clearly discernible legislative intent, then the reviewing court "does not simply impose its own construction on the statute." ... Instead, we then must conduct the "narrower inquiry into whether the [agency's] construction was 'sufficiently reasonable' to be accepted by a reviewing court."
 
 
 29
 General Motors Corp. v. Ruckelshaus, 742 F.2d at 1566-67 (citations omitted). The EPA's definition is certainly not contrary to any "clearly discernible legislative intent" and is "sufficiently reasonable" to be accorded deference. We therefore find that the EPA's definition was properly used to decide the acceptability of the Michigan rules.
 
 
 30
 Concerning the publication requirements of 5 U.S.C. Sec. 552, even if EPA's definition were subject to these requirements, the statutory exception for actual notice to the affected party would apply. It states that "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by a matter required to be published in the Federal Register and not so published." 5 U.S.C. Sec. 552(a). As early as July 1984, Michigan had actual and timely notice of the EPA's definition in this particular proceeding. We also note that the EPA referenced its definition in an earlier Michigan proceeding concerning emissions from iron and steel processes. 45 Fed.Reg. 59,329 (1980).
 
 
 31
 As a further argument, Michigan maintains that EPA's prior approval of the fugitive dust rules of Illinois and Wisconsin precludes the Agency from disapproving the Michigan rules. The state argues that EPA has not provided a rational explanation for its departure from these prior approvals. Michigan also argues that the EPA is collaterally, judicially, and equitably estopped from disapproving the Michigan rules as a result of the Agency's position in Citizens for a Better Environment v. EPA, 649 F.2d 522 (7th Cir.1981), a decision upholding the Agency's approval of the Illinois rule. We disagree.
 
 
 32
 An administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified. Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion); Ohio Fast Freight, Inc. v. United States, 574 F.2d 316, 319 (6th Cir.1978); see also American Trucking Ass'n v. A.T. & S.F.R. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) (administrative agencies are "neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday"). If the departure from precedent is explained, our review is limited to whether the rationale is so unreasonable as to be arbitrary and capricious. West Coast Media, Inc. v. F.C.C., 695 F.2d 617, 620-21 (D.C.Cir.1982), cert. denied, 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 87 (1983).
 
 
 33
 In this case, the EPA has made its reasons explicit for departing from its decisions in the Illinois and Wisconsin cases. In testimony before the Michigan Air Pollution Control Commission on January 15, 1985, the Agency stated:
 
 
 34
 It is not difficult to explain why USEPA might now disapprove a regulation that it approved five years ago and which approval it defended in court. The answer is that the Agency now knows more about RACT for industrial fugitive dust and knows more about the kind of control programs and permits that a state might approve under such a rule. Most of the field test data on the effectiveness of different fugitive dust control techniques and programs have only become available since Illinois rule 203(f) was approved on February 21, 1980. While this data is not as extensive as we would like (most data bases are lacking in some respect), it does indicate clearly that the specifics of any control program are very much related to the control effectiveness achieved. By "specifics" I am referring to the type of control equipment or suppressant used, the application or cleaning frequency, the application intensity, the dilution ratio of a dust suppressant, the conditions under which control measures may be suspended, etc.
 
 
 35
 Secondly, USEPA has learned that industrial fugitive dust rules do not insure the implementation of RACT when they only describe in general terms what control measures are acceptable and leave the specifics to be determined on a case-by-case basis by the state. USEPA has now seen in Illinois, Wisconsin and Ohio that rules based on this approach result in a wide range of control requirements that vary greatly in their specificity and relative stringency. Many of the resulting control programs, moreover, are vague and dependent on owner/operator judgment. As a result, it is virtually impossible to know what specific control measures are required to be implemented. In 1983, USEPA arranged for a contractor to compile, review and summarize the source-specific industrial fugitive dust control programs required in Region V's primary TSP nonattainment areas. For Ohio, Illinois and Wisconsin, the contractor, in 1984, concluded as follows:
 
 
 36
 The generality of the [state's] rule naturally produces control programs which lack specificity. The result is that control efficiencies and resultant emission reductions cannot be estimated for the majority of control plans....
 
 
 37
 USEPA's experience and review of such programs confirms this judgment.
 
 
 38
 In the Notice of Proposed Rulemaking, the EPA reiterated its concern with the vagueness of the rules. See 50 Fed.Reg. at 23,030. In its final action, the EPA referenced its January 15, 1985, comments. See 50 Fed.Reg. at 33,538. The EPA explicitly stated that although Michigan had clarified and tightened the Illinois rule in several respects, the Agency
 
 
 39
 continues to believe that the failure of the Illinois rule to obtain RACT-level permits and control plans, as discussed in USEPA's technical support document of April 25, 1985, is relevant to Michigan's Rule 336.1373, since the latter rule continues to allow wide discretion by the Commission in determining acceptable control program content. In fact, 336.1373(2)(a)(vi)(A)-(G) which specify the items to be included in an operating program "at a minimum", were not revised from the Illinois rule model. Programs approved under the Illinois rule were characterized by vague and unenforceable requirements such as road sweeping, or dust suppressant application "as necessary."
 
 
 40
 Id. at 33,537-538.
 
 
 41
 For us is left the task of reviewing these reasons to determine if the departure from precedent is arbitrary and capricious. After examining the record, we are convinced that the EPA had a rational basis for its decision. The Agency reviewed programs conducted in other states under similar rules and concluded that such rules do not guarantee the implementation of reasonably available control technology in nonattainment areas. Moreover, EPA has determined that sufficient data now exist to define more narrowly reasonably available control technology for the fugitive dust source categories to be covered by the submitted rules. In light of our narrow standard of review, we conclude that the administrative record provides a rational basis for the Agency's decision to disapprove the rules, thus departing from its prior decisions.[1]
 
 
 42
 Michigan's argument that the EPA is collaterally, judicially, and equitably estopped from disapproving the Michigan rules as a result of the Agency's position in Citizens for a Better Environment is also without merit. Each of the estoppel arguments is flawed in more than one respect, but a problem common to all three theories is that the issue involved here is not the same one litigated in Citizens. In that case, the EPA had to defend its approval of the Illinois fugitive dust emission control rule against attacks that it was unenforceable and that it did not ensure that reasonably available control technology would be implemented "as expeditiously as practicable" under 42 U.S.C. Sec. 7502(b)(2). The issue was not, as here, whether the rule was in fact "reasonably available control technology" under 42 U.S.C. Sec. 7502(b)(3). Moreover, to the degree that factual similarities between the two cases exist, the situations are fundamentally different in that the EPA has more technical information now than it did in February, 1980, when it approved the Illinois rule. At no time should an agency be estopped from using its increased expertise.
 
 
 43
 Michigan further argues that the EPA's past practices and the Citizens decision preclude the Agency from requiring that each operating program under Rule 336.1371 and Rule 336.1373 be submitted as a state implementation plan revision. Not only is this claim a misguided attempt to apply the Citizens case to these facts as discussed above, it is a misconstruction of the EPA's action in this case. Concerning Rule 336.1371, in this proceeding the EPA has not argued that Michigan was required to submit fugitive dust rules for attainment areas. In approving Rules 336.1371 and 336.1372 as a framework for establishment of a program to assure maintenance of the total suspended particulate ambient air quality standard, the EPA merely stated that if the state wants federal approval of the specific requirements, then these must be submitted as revisions. 50 Fed.Reg. at 23,030. Concerning Rule 336.1373 and source-specific implementation plan revisions, the Agency stated:
 
 
 44
 USEPA is not prescribing any particular approach for the State to meet Part D requirements. The State may want to submit all the individual control programs for sources in nonattainment areas as source-specific SIP revisions.
 
 
 45
 Alternatively, the State may want to develop a new regulation that does not call for the development of individual programs.
 
 
 46
 50 Fed.Reg. at 33,538. The Administrator's actions with respect to these decisions were clearly not arbitrary and capricious.
 
 
 47
 Michigan next argues that the approval of the rules under section 110(a)(2) of the Act, but disapproval for Part D purposes, is invalid under Bethlehem Steel Corp. v. Gorsuch, 742 F.2d 1028 (7th Cir.1984), and Indiana & Michigan Electric Co. v. EPA, 733 F.2d 489 (7th Cir.1984). These decisions establish the principle that the EPA may not partially approve a state implementation plan revision if such partial approval would render the submitted regulation significantly more stringent than intended by the state. While the principle is a valid one, it is inapplicable to this case. As to the approval of Rules 336.1371 and 336.1372 as a framework to assure maintenance of air quality, the EPA's statement that specific programs must be submitted as plan revisions to accord federal approval simply does not make the approved rules significantly more stringent than the state had intended. With respect to Rule 336.1373, EPA approved the rule in its entirety for section 110(a)(2) purposes but disapproved it as failing to satisfy the Part D requirements. Sources in nonattainment areas are thus subject to the exact regulation that Michigan submitted to the EPA. The fact that Michigan must submit new regulations to satisfy the Part D requirements does not make the approved Rule 336.1373 more stringent than when it was originally submitted.
 
 
 48
 Michigan argues that the EPA did not give adequate responses to comments made on the May 30, 1985, proposed rulemaking. The Agency's responsibility to respond to public comments on proposed rulemaking is required by 5 U.S.C. Sec. 553(c). See PPG Industries, Inc. v. Costle, 630 F.2d 462, 466 (6th Cir.1980). We note that pursuant to this requirement, an administrative agency "need not respond to every comment, but it must 'respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.' " Action on Smoking and Health v. C.A.B., 699 F.2d 1209, 1216 (D.C.Cir.1983) (quoting Rodway v. U.S. Dep't of Agriculture, 514 F.2d 809, 817 (D.C.Cir.1975)). While we acknowledge the Agency's duty to respond to public comments as an important one, having reviewed Michigan's claims of inadequacy, we find this claim to be insubstantial and without merit. The EPA's final rulemaking and technical support document provide reasoned explanations for its action in this case and have sufficiently responded to public comments.
 
 
 49
 As part of an alternative argument, Michigan contends that the immediate imposition of the construction moratorium was arbitrary and capricious and contrary to the Agency's policy on such bans. This argument also has no merit. Section 110(a)(2)(I) of the Clean Air Act clearly requires that the construction moratorium be in effect in nonattainment areas unless the state implementation plan meets the requirements of Part D of the Clean Air Act. 42 U.S.C. Sec. 7410(a)(2)(I). EPA's published policy statement concerning compliance with Part D of the Act is also in accordance with this construction ban. In areas that have a plan which fulfills the Part D requirements while not producing attainment of the ambient air quality standards by December 31, 1982, the EPA has determined not to impose the construction ban. See 48 Fed.Reg. 50,686 (1983). However, if a nonattainment area does not have a plan that meets the Part D requirements, a construction ban must be imposed.[2] Id.; see also 42 U.S.C. Sec. 7410(a)(2)(I).
 
 
 50
 Michigan claims that the EPA violated section 3 of Executive Order 12,291, reprinted at 5 U.S.C. Sec. 601. The state argues that the Agency's final action was a "major rule" as defined in the Order's section 1(b), and thus required a Regulatory Impact Analysis. In its final action, the Agency disputed that its action is a "major rule" and stated that because its action is required as a matter of law, a Regulatory Impact Analysis would not affect its decision. 50 Fed.Reg. at 33,540. On appeal, the EPA argues that section 9 of the Executive Order precludes judicial review of the Agency's compliance with the Order.
 
 
 51
 Section 9 of Executive Order 12,291 states in relevant part that "[t]his Order is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers or any person." Given this clear and unequivocal intent that agency compliance with Executive Order 12,291 not be subject to judicial review, we hold that the Order provides no basis for rejecting the EPA's final action. The Order was intended "to improve the internal management of the Federal government" and not to confer rights judicially enforceable in private litigation. Cf. In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1357 (D.C.Cir.1980) (executive order concerning inflationary impact statements did not provide a legal framework for private civil actions).
 
 
 52
 In a similar argument, Michigan next claims that the EPA violated the Regulatory Flexibility Act, 5 U.S.C. Secs. 601-612. Under this Act, a federal agency must prepare an initial regulatory flexibility analysis to accompany any proposed rule that requires a general notice of proposed rulemaking. The initial analysis must contain a description of the proposed rule's impact on small entities and any significant alternatives to the action which "accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." See 5 U.S.C. Sec. 603. A similar regulatory flexibility analysis must accompany the promulgation of the final rule. Id. at Sec. 604. In order to avoid unnecessary analyses, the head of an agency may certify that a proposed or final rule will not have "a significant economic impact on a substantial number of small entities." Id. at Sec. 605(b). A federal agency may also comply with the Act by performing the required analysis in conjunction with any other analysis required by law. Id. at Sec. 605(a).
 
 
 53
 In its notice of proposed rulemaking, EPA stated that it did not have sufficient information to determine the construction ban's impact on small entities because "it is difficult to obtain reliable information on future plans for business growth." 50 Fed.Reg. at 23,031. The Agency further stated that a flexibility analysis would be useless given its position that the imposition of the ban would be required by law upon a determination of Part D inadequacy. Id. In its final action, the Agency claimed that pursuant to 5 U.S.C. Sec. 605(a), "[a]ll of the analysis required by the Act was performed as part of the rulemaking and contained in either the rulemaking notices or the docket." 50 Fed.Reg. at 33,540. It again noted that the automatic and mandatory imposition of a construction ban left the Agency with no legally available "significant alternatives." Id.
 
 
 54
 Michigan argues that either EPA should have certified under 5 U.S.C. Sec. 605(b) that the final action would not have a significant impact on small entities, or it should have performed such an analysis and considered alternatives such as approving the rules or issuing only a section 110(a)(2)(H) deficiency notice. The EPA argues that compliance with the Regulatory Flexibility Act is not subject to judicial review.
 
 The Regulatory Flexibility Act states:
 
 55
 (a) Except as otherwise provided in subsection (b), any determination by an agency concerning the applicability of any of the provisions of this chapter to any action of the agency shall not be subject to judicial review.
 
 
 56
 (b) Any regulatory flexibility analysis prepared under sections 603 and 604 of this title and the compliance or noncompliance of the agency with the provisions of this chapter shall not be subject to judicial review. When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.
 
 
 57
 5 U.S.C. Sec. 611(a), (b). The question of judicial review under the Regulatory Flexibility Act has not been considered in this Circuit. The District of Columbia Circuit, however, has analyzed the Act's clear wording and its legislative history and concluded that although an agency's compliance with the Act itself is not subject to judicial review, the contents of the analysis should be considered in determining whether a rule is reasonable. See Thompson v. Clark, 741 F.2d 401, 405 (D.C.Cir.1984); Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 539 (D.C.Cir.1983). We adopt this conclusion. As pointed out in Thompson v. Clark, such judicial review does not mean that an agency may "ignore with impunity the effect of its rules upon small entities;" the agency's decision may still be overturned because of an analysis so defective as to render its final decision unreasonable, or, in the absence of any analysis, because of a failure to respond to public comment concerning the rule's impact on small entities. 741 F.2d at 408.
 
 
 58
 In this case, the EPA performed its regulatory flexibility analysis in the context of its overall rulemaking analysis. As we have noted earlier in this opinion, the Agency's disapproval of the Michigan plan for Part D purposes was reasonable and the imposition of the construction moratorium was then required by law. The fact that the EPA did not consider any significant alternatives to the construction ban is certainly not unreasonable under these circumstances. The EPA's failure to certify the proposed rule under section 605(b) as having no significant impact on small entities or, in the alternative, to prepare a complete initial regulatory flexibility analysis under section 603 does not affect the reasonableness of the final action.
 
 
 59
 We have carefully considered all of Michigan's arguments not specifically addressed in this opinion. We have found that these arguments are without merit and do not warrant further discussion.
 
 
 60
 For the reasons discussed in this opinion, the decision of the EPA is affirmed except that this Court stays the imposition of the construction moratorium for six months from the filing date of this opinion.
 
 
 
 [1]
 Michigan has also claimed that EPA's final action violates the due process clause of the fifth amendment. The state argues that by approving similar rules in Illinois and Wisconsin while disapproving the rules in Michigan, EPA has unconstitutionally discriminated against business and industry in Michigan. Given our holding that the EPA has established a rational basis for its action, this argument is without merit and deserves no further discussion
 
 
 [2]
 Michigan's argument that EPA violated the state's due process rights by failing to provide sufficient notice of the moratorium's imposition is incredible. Although the December 2, 1983, notice of proposed rulemaking discussed only a section 110(a)(2)(H) notice, the state received informal notice of a construction ban as early as March, 1984. Formal notice was clearly given in the May 30, 1985, proposed rulemaking. 50 Fed.Reg. at 23,028 (1985). Such notice was sufficient; imposition of the construction ban, moreover, is required by law