**ASSOCIATED FISHERIES OF MAINE, INC., Plaintiff,**

v.

**William DALEY, Secretary of Commerce, et al., Defendants.**

**Civil No. 94–89–P–H.**

United States District Court, D. Maine.

Feb. 3, 1997.

384

Robert C. Brooks, William S. Harwood, Marianne McGettigan, Verrill & Dana, Portland, Maine, and Gene R. Libby, Verrill & Dana, Kennebunk, Maine, for Plaintiff.

David R. Collins, Asst. U.S. Atty., Office of the U.S. Attorney, Portland, Maine, Elinor Colbourn, and Charles W. Brooks, U.S. Dept. of Justice, Environment & Natural Resource, Washington, D.C., for Defendants.

---

1. In addition to the Secretary, the plaintiff also sued James Baker, Under Secretary of Commerce; Rolland A. Schmitten, Assistant Administrator, National Marine Fisheries Service; and Andrew A. Rosenberg, Northeast Regional Director, National Marine Fisheries Service.

2. "F" expresses that part of the total mortality rate of the stock attributable to fishing-related deaths in a given year.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HORNBY, Chief Judge.

### INTRODUCTION

Associated Fisheries of Maine, Inc. ("Associated Fisheries") is challenging Amendments 5 and 7 to the Northeast Multispecies Fishery Management Plan. These Amendments, adopted by the Secretary of Commerce [1] upon recommendation of the New England Fishery Management Council, respond to a perceived threat to the cod, haddock and yellowtail flounder populations in the fishery. Amendment 5 was promulgated March 1, 1994, and was designed to avoid further depletion of these groundfish stocks. Amendment 7 was promulgated May 31, 1996, and places tougher restrictions on fishing vessels than Amendment 5. The stated goal of Amendment 7 is to reduce groundfish mortality due to fishing to almost zero ($F = 0.1$) [2] so that stocks actually rebuild rather than hold even. Associated Fisheries asserts that both Amendments are disastrous for small fishing boats—particularly the trawling industry—in the area. Associated Fisheries challenges the Amendments under the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq., the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; § 701 et seq., the Magnuson Act, 16 U.S.C. § 1801 et seq., and Executive Orders 12,291 and 12,866, 46 Fed.Reg. 13,193 (1981); 58 Fed.Reg. 51,735 (1993). Associated Fisheries also argues that section 208 of the Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, 100 Stat. 3009 (1996), bans implementation of Amendment 7.[3]

Although these issues have been presented to me in the form of summary judgment motions with statements of disputed and undisputed facts, my task is to review the ad-

---

3. In their Second Amended Complaint, Associated Fisheries alleges that Amendment 7 also violates the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and the plaintiff's due process rights. These issues have not been raised in the plaintiff's summary judgment briefs. I therefore consider them waived.

ministrative record and to apply the law to this record. I conclude that Associated Fisheries's challenge to Amendment 7 cannot be sustained. I therefore need not address the enforceability of Amendment 5.

## STANDING

■ The Secretary has challenged Associated Fisheries's standing, but the argument cannot be taken seriously. Associated Fisheries meets all the requirements of standing recently laid out in *Dubois v. United States Dep't of Agriculture*, 102 F.3d 1273, 1280–81 n. 11 (1st Cir.1996).[4] Associated Fisheries of Maine, Inc. is a membership organization whose objective is to protect the interests of commercial fishermen. The ability to fish commercially is directly affected by the new regulation in a concrete and particularized fashion that is actual, distinct and palpable, not conjectural or hypothetical. The Secretary argues that the amendments in the long run will actually improve the Northeast fishery stocks, but that contention goes to the heart of the merits of the dispute and does not affect standing. (The Secretary's own studies project that Amendment 7 will cause some financial hardship for fishing vessels. A.R. 10915A.227–29.) Neither the claim asserted nor the relief requested requires the personal participation of individual Associated Fisheries members in this lawsuit and one or more of the members certainly would satisfy the individual requirements for standing in his or her own right.[5]

## THE REGULATORY FLEXIBILITY ACT

■ Associated Fisheries claims that the Secretary violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*, in pro-

mulgating Amendment 7, by failing to perform an adequate final regulatory flexibility analysis. I find that the agency complied with the RFA as it applied to the promulgation of Amendment 7.

Before the RFA was last amended on March 29, 1996, Pub.L. No. 104–121, 110 Stat. 864, effective June 27, 1996, section 604(a) provided:

When an agency promulgates a final rule . . ., the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

(1) a succinct statement of the need for, and the objectives of, the rule;

(2) a summary of the issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; and

(3) a description of each of the significant alternatives to the rule consistent with the stated objectives of applicable statutes and designed to minimize any significant economic impact of the rule on small entities which was considered by the agency, and a statement of the reasons why each one of such alternatives was rejected.

5 U.S.C. § 604(a). This was the provision in effect when the Secretary promulgated Amendment 7 to the Fishery Management Plan on May 31, 1996.

As its final regulatory flexibility analysis, the agency combined its initial regulatory flexibility analysis, performed under section 603 of the RFA, with its response to com-

---

4. *Dubois* requires "injury in fact" that is "concrete and particularized," "actual or imminent, not conjectural or hypothetical," "distinct and palpable," "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," falling "within the zone of interests protected by the law invoked"; a membership organization may assert the claims of members "provided that one or more of its members would satisfy the individual requirements for standing in his or her own right," "the interests that the suit seeks to vindicate must be germane to the objectives for which the organization was formed; and neither the claim asserted nor the relief requested requires

the personal participation of affected individuals."

5. I find it unnecessary to resolve whether issue preclusion also determines the standing issue here against the Secretary. In the case Associated Fisheries relies upon, *Conservation Law Found. v. Mosbacher*, 966 F.2d 39 (1st Cir.1992), Associated Fisheries was permitted to intervene as of right, and the Secretary specifically took no position on its intervention there. 966 F.2d at 41. Only public interest groups who had brought the lawsuit opposed the intervention. *Id.*

ments it received. A.R. 13176, 13197–98. Associated Fisheries complains that the Secretary improperly failed to comply with requirement (3), in failing to examine the effect of Amendment 7 on small businesses (particularly trawlers and other small fishing boats), and in failing to identify and examine alternatives that would reduce the burden on these entities. The final rule issued by the agency, however, carefully lists the comments and responses the Secretary received and explains why alternatives that would reduce the burden on small entities were rejected. A.R. 13178 *et seq.* Associated Fisheries may be correct that not every alternative has been considered by the agency, but the RFA requires examination only of "significant" ones. 5 U.S.C. § 604(a)(3). I am satisfied that the Secretary fulfilled this requirement. Indeed, much of the eighteen pages that are the comments and responses portion of the final rule are directed to a discussion of alternatives. *See, e.g.,* responses to comment numbers 12–14, 18, 22–23, 25–27, 35, 37, 39–40, 43, 48, 58 and 65. In addition, the agency describes many alternatives and public discussions of these alternatives in the Final Supplemental Environmental Impact Statement for Amendment 7. A.R. 10915A.68–77.

■ Moreover, I now conclude—contrary to my statements at oral argument on August 8, 1996—that judicial review is unavailable on this claim. Until the RFA was amended by the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), Pub.L. No. 104–121, 110 Stat. 857, 864–68 (1996), section 611 expressly prohibited judicial review. 5 U.S.C. § 611. The March 29, 1996, amendments added judicial review for certain provisions, sec. 242, § 611, but delayed the effective date for ninety days, sec.

245, namely, until June 27, 1996, almost a full month after the final rule implementing Amendment 7 was published. Because the Second Amended Complaint was filed after June 27, 1996, I stated at oral argument that judicial review applied in the absence of any explicit prohibition.[6] At oral argument, however, I was not focusing on the fact that the March 29 amendments also added requirements an agency must undertake in promulgating a final regulatory flexibility analysis. Sec. 241(b). Such additions obviously cannot apply to a final regulatory flexibility analysis previously promulgated. It would be anomalous to apply the judicial review portion of the 1996 amendments to past agency actions but at the same time not apply the substance of those amendments, unless Congress expressly stated that was its intent. But Congress did not. The amendments introduced by SBREFA were one legislative package and therefore should be interpreted consistently throughout where Congress has made no differentiation.[7] I conclude that judicial review is not available for Amendment 7 promulgated on May 31, 1996.[8]

### THE ADMINISTRATIVE PROCEDURE ACT

Associated Fisheries claims that the Secretary failed to conscientiously consider comments responding to Amendment 7, and that the comment period was therefore just an empty exercise, in violation of section 553(c) of the Administrative Procedure Act ("APA"). It claims that the Secretary thereby engaged in arbitrary and capricious rulemaking under section 706(2) of the APA, which states: "a reviewing court shall hold unlawful and set aside agency action ... found to be arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law."

---

6. Congress provided such a prohibition in SBREFA for interpretative rules, sec. 245, which these are not.

7. The legislative history to SBREFA, albeit scarce, also weighs against applying the judicial review provision to past agency action. According to Representative Hyde, the judicial review provision applies to "any final regulation published after the effective date, regardless of when the rule was proposed." 142 Cong.Rec. E571–01, E574 (daily ed. Apr. 19, 1996). Representative Hyde also stated: "For rules promulgated

after the effective date, judicial review will be available pursuant to this Act." *Id.*

8. In reviewing the administrative record for arbitrariness and capriciousness under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* and the Magnuson Act, 16 U.S.C. § 1801 *et seq.,* I nevertheless consider the process and the results of the regulatory flexibility analysis as described in *Thompson v. Clark,* 741 F.2d 401, 405 (D.C.Cir.1984).

■ The central focus of this arbitrary and capricious claim is Associated Fisheries's argument that the agency had previously made up its mind to change its rulemaking goal from (a) rebuilding stocks of groundfish to (b) reducing groundfish mortality to F = 0.1, and that the agency went forward single-mindedly to pursue its new goal without consideration of comments. The administrative record supports a finding, however, that the agency did consider comments. For example, eighteen pages of the final rule, as it was published in the Federal Register, were devoted to a discussion of comments and responses. 61 Fed.Reg. 27,709, 27,711 *et seq.* (1996) (to be codified at 50 C.F.R. pt. 651); A.R. 13176, 13178 *et seq.* As another example, the administrative record also contains an internal memorandum between agency staff in which the plaintiff's submitted comments were analyzed paragraph by paragraph. A.R. 12824–30. Although Associated Fisheries may believe that the agency's position was fixed from the outset, a court can only review whether the agency record shows fair consideration and treatment of the comments. The record here does so.

## THE MAGNUSON ACT

The Magnuson Act, 16 U.S.C. § 1801 *et seq.*, makes the Secretary responsible for fishery management plans. The purpose of these plans is "to prevent overfishing, to rebuild overfished stocks, to insure conservation, and to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(6). Where, as here, a Council (New England Fishery Management Council) develops the plan, the Secretary must review it, publish notice of it, receive comments, and "take into account the data, views, and comments received from interested persons[.]" *Id.* § 1854(a)(2)(A). As discussed above, the administrative record demonstrates that comments were considered, or "take[n] into account." The First Circuit has articulated the following deferential standard for judicial review under the Magnuson Act:

The Secretary of Commerce, in the exercise of her conservation and management authority under the Act, has substantial discretion in selecting the appropriate quota for a given fishery.... A reviewing court may decide only whether this discretion was exercised rationally and consistently with the standards set by Congress ... and may not substitute its own judgment as to values and priorities for that of the Secretary.

*State of Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977) (citations omitted).

■ The Magnuson Act requires that all fishery management plans be consistent with seven "National Standards." 16 U.S.C. § 1851. Associated Fisheries argues that in drafting Amendment 7, the Secretary failed to comply with four of these standards, specifically the following:

(2) Conservation and management measures shall be based upon the best scientific information available.

. . . .

(5) Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

16 U.S.C. § 1851(a).

The administrative record in this case contains approximately 30,000 pages. In order to assist me in finding my way through the record and help me understand science, economics, statistics, fishery management principles and the fishing industry, I permitted the parties to present their respective experts at a day-long hearing on January 27, 1997, to explain to me their positions supporting or attacking what the Secretary has done.[9] Based on those presentations and on

---

9. As I said in my Order of December 18, 1996, those presentations on the record were not evidence, but rather were advocacy presentations by non-lawyers skilled in their respective areas and therefore better able to present the material to me.

the briefs, I conclude, first, that there is not much disagreement that the ground fishery is in bad shape, and second, that the primary area of disagreement is how rapidly it must be permitted to recover.

Associated Fisheries attacks Amendment 7 on many grounds, but the following are key:

(1) The science is generally unreliable inasmuch as there are problems with the quantitative data concerning species population and the inability to say with confidence that factors other than overfishing (for example, environmental factors) are not at work in depleting the groundfish.

(2) The economic analysis by which the Secretary predicts that over ten years Amendment 7 will have a net benefit as compared to Amendment 5 is defective in the following ways: (a) it fails to take into account Coast Guard enforcement costs; (b) it improperly treats crew payments as costs when crew members are actually joint venturers; (c) because of the uncertainties in the data, the benefits in years 8, 9 and 10 for Amendment 7 are actually far less certain than the disadvantages, or costs, in the early years.

(3) The management practices chosen (for example, days-at-sea limitations) have more costly and negative effects than equally effective alternatives (for example, closing certain areas).

(4) Amendment 5 was never given enough chance to see what effect it would have (although Associated Fisheries also challenges Amendment 5).

In sum, Associated Fisheries's case primarily is that Amendment 7 has a drastic effect on the fishing industry with little assurance that it will rebuild the fishing stocks substantially sooner than Amendment 5 will rebuild the stocks.

It is not surprising that Associated Fisheries is seeking relief from Amendment 7 on behalf of its members. Few would disagree that the New England fishing industry is facing a monumental crisis, and for many communities a traditional way of life is at stake. But unfortunately for Associated Fisheries, to state the differences between the parties is to answer them so far as the legal analysis is concerned:

(1) Difficulties with the data and science are to be expected in dealing with a resource as elusive as fisheries. The Secretary is directed to use the "best science available," but that assessment is obviously a matter of judgment and discretion. The disagreements here (how far back in time to consider landing data, inferences to be drawn from fisheries data here and in Canada, the spawning biomass necessary for successful rebuilding, etc.) do not show any abuse of discretion in using the "best science available."

(2) Economists can argue in good faith over whether crew payments should be treated as a cost, but it is hardly arbitrary and capricious for the Secretary to make the choice to treat them as such in the analysis. Undoubtedly there are enforcement costs, but the Secretary is not required to accept at face value the Coast Guard's budget estimate, and may make the judgment that in actuality there would be no material difference in enforcement costs between Amendment 5 and Amendment 7. There are uncertainties in the projected net benefits and there will be drastic effects for the fishing industry, but that is not the same as demonstrating that the Secretary has not made a good faith judgment as to what measures will achieve the optimum yield.

(3) Choices between management practices involve discretionary judgments over likely enforcement costs and assessments of how the industry will respond (for example, the Secretary may conclude that a particular practice like closing an area will lead fisherman to put too much pressure on another part of the fishery in order to make a living).

(4) The Secretary is not limited to an earlier solution (Amendment 5) if new data show that the fishery is in direr straits than previously thought.

In short, what the record reflects is strenuous disagreement among the scientists and economists—disagreements that are good faith differences in how to interpret data, analyze difficult problems, interpret the past and predict the future. But the record does

not demonstrate that the Secretary has abused his discretion or has failed to follow the standards set by Congress. The goal is to preserve the fishery to obtain its optimum yield, 16 U.S.C. § 1851(a)(1), and "economic allocation" is never to be the "sole purpose" of a measure, *id.* § 1851(a)(5). It is appropriate, therefore, for the Secretary to be conservative in dealing with the issue of conservation and, in the face of uncertainty, to take the more strenuous measures—even though they may unfortunately have a short term drastic negative effect on the fishing industry.

### EXECUTIVE ORDERS 12,291 AND 12,866

 Associated Fisheries also argues that Amendment 7 violates Executive Order 12,291, 46 Fed.Reg. 13,193 (1981), and Executive Order 12,866, 58 Fed.Reg. 51,735 (1993). Section 11 of Executive Order 12,866 revokes Executive Order 12,291. The revocation was effective on September 30, 1993, before either Amendment 5 or 7 was promulgated. As a result, Executive Order 12,291 does not apply to this case. Moreover, there is no private cause of action under either of these Executive Orders. Section 10 of Executive Order 12,866 states in relevant part: "This executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." *See State of Michigan v. Thomas,* 805 F.2d 176, 187 (6th Cir.1986) (finding no private cause of action under Executive Order 12,291 because of the same language); *Ishtyaq v. Nelson,* 627 F.Supp. 13, 24 (E.D.N.Y.1983) (same).

 Associated Fisheries argues that it has a right to judicial review of compliance with the Executive Order indirectly through the Magnuson Act. Specifically, judicial review is available under the Magnuson Act, *see* 16 U.S.C. § 1855(b), and section 1855(e) of that Act states that Executive Order 12,291 (among other laws) "shall be complied with within the time limitations specified in subsection (c) or section 304(a) and (b) as

they apply to the functions of the Secretary under such provisions." Associated Fisheries argues that because the Magnuson Act thereby requires that Executive Order 12,291 "be complied with" and because judicial review is available under the Magnuson Act, judicial review is therefore available to ensure compliance with Executive Order 12,291. I disagree. On its face, section 1855(e) addresses only timeliness issues. The section is designed to eliminate the ability of an agency to argue that the need to comply with laws like the Executive Order allows it to delay compliance with the Magnuson Act requirements. All section 1855(e) instructs is that the time limits in the Magnuson Act must be observed. The legislative history supports this conclusion. The House Report states that this provision of the Magnuson Act responds to "concerns raised at the hearings ... related to the timeliness of actions taken by the Councils and the Secretary in the implementation of conservation and management measures" and "indicat[es] that neither the Paperwork Reduction Act of 1980, the Regulatory Flexibility Act, or Executive Order 12,291 shall affect, in any manner, the time limitations or procedural requirements specified in the Act...." H.R.Rep. No. 97–549, at 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4320, 4343.

### OMNIBUS APPROPRIATIONS ACT OF 1997

Associated Fisheries contends that section 208 of the Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, 110 Stat. 3009 (1996), bans the Secretary from implementing Amendment 7. Section 208 states:

> None of the funds appropriated under this Act or any other Act henceforth may be used to develop new fishery management plans, amendments, or regulations which create new individual fishing quota programs ... or to implement any such plans, amendments, or regulations approved by a Regional Fishery Management Council or the Secretary after January 4, 1995, until offsetting fees to pay for the cost of administering such plans, amendments, or regulations are expressly authorized under the Magnuson Fishery Conservation and Management Act.

*Id.* § 208. I find that section 208 does not apply to Amendment 7 because Amendment 7 is not an "individual fishing quota program" under the Appropriations Act, and even if it was, funding has been authorized under the Magnuson Act.

 Congress defined "individual fishing quota" in section 102(21) of the Sustainable Fisheries Act, Pub.L. No. 104–297, 110 Stat. 3559 (1996), which reauthorized the Magnuson Act eleven days after the Appropriations Act was enacted. Section 102(21) states:

> The term 'individual fishing quota' means a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the total allowable catch of a fishery that may be received or held for exclusive use by a person.

*Id.* § 102(21), 110 Stat. 3562. Since Amendment 7 in no way limits access to the fishery for individual vessels or fishermen to a percentage of the total allowable catch, it is not an "individual fishing quota" program.

Furthermore, the Sustainable Fisheries Act amends the Magnuson Act to provide for offsetting fees to pay the costs of administering "individual fishing quota programs." Pub.L. No. 104–297, § 109(c)(2), 110 Stat. 3559, 3583 (1996). Therefore, even if I were to find that Amendment 7 is an "individual fishing quota program" under the Appropriations Act, offsetting fees have been authorized, and the Appropriations Act accordingly does not prohibit the Amendment. The plaintiff's motion that I strike the Secretary's pleadings filed after the passage of the Appropriations Act is DENIED.

### CONCLUSION

Amendment 7 regrettably will have a harsh effect on the fishing industry, a significant means of support for many coastal families and communities, and part of our social, cultural and economic heritage. But it is a rational, though controversial, choice within the Secretary's statutory mandate, and it has been promulgated according to the procedures required by the applicable statutes. Based on a careful review of the administrative record in this case, I find that the Secretary acted within the scope of his broad discretion to promulgate regulations implementing fishery management plans.

Accordingly, judgment shall be entered for the defendants and against the plaintiff.

So ORDERED.